UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBIN G. RAWSON,                    )
                                    )
              Plaintiff,            )
                                    )
         vs.                        )          No. 4:05-CV-1432 (CEJ)
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social             )
Security,                          )
                                    )
              Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On August 25, 2003, plaintiff Robin G. Rawson filed applications for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, (Tr. 41-43), and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. 196-200). After plaintiff's application was denied on initial consideration (Tr. 30-34), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 35-36).

The hearing was held on February 1, 2005. (Tr. 209). Plaintiff was represented by counsel. (Tr. 209-23). The ALJ issued a decision on March 2, 2005, denying plaintiff's claim. (Tr. 7-20). The Appeals Council denied plaintiff's request for review on August 3, 2005. (Tr. 4-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Testimony at the Hearing

Plaintiff was the sole witness at the February 1, 2005 hearing. At that time, plaintiff was 44 years old and resided with three adults. (Tr. 210). She had completed the seventh grade. (Tr. 211). She was 5 feet 7 inches tall and weighed 140 pounds. She is right-handed.

Plaintiff testified that she sustained a work-related injury to her back on March 8, 2002. At that time, she was employed as a rubber-stamp assembler in Florida. She testified that she had not worked since the accident. In 2003, she received $10,000 in settlement of her Worker's Compensation Claim. (Tr. 211). Plaintiff began receiving Medicaid benefits in 2004. (Tr. 217).

Plaintiff testified that she was unable to work because she could not stand or sit for very long. She testified that she felt pain in her right side (Tr. 211). She also experienced "terrible" back pain, both above and below the belt line. On several occasions, and without warning, she lost her balance and fell when putting pressure on her right leg. The onset of the pain in her right leg was recent and initially was limited to an area at the top of her leg. By the time of the hearing, however, the pain was very intense and went "all the way down to [her] toes." (Tr. 212).

Plaintiff testified that she could stand for about fifteen minutes. Sitting or standing without moving around caused pain in her entire right side, including her arm. (Tr. 213). She could

not walk as far as a block without experiencing cramps or muscle spasms. Bending caused "excruciating pain" and she sometimes felt as if she might fall forward. Turning her head increased the pain in her back. Her sleep was interrupted by the need to shift positions frequently. (Tr. 214).

Plaintiff testified that she recently underwent a CAT scan that disclosed three or four ruptured or herniated discs. (Tr. 217). Although she was referred to an orthopedic surgeon, she did not follow through because she was concerned about being unable to walk for 36 hours after the procedure. (Tr. 217). Plaintiff was prescribed Lorcet[1] and Soma[2] for her back. (Tr. 218). Medication sometimes eased the pain.

With regard to other conditions, plaintiff testified that her primary care physician treated her for adult attention deficit disorder, anxiety disorder, panic attacks, and depression. She testified that she had had ten panic attacks in the previous three months. She could not identify a precipitating event, other than being "upset or nervous." (Tr. 215). When asked what particular things made her upset or nervous, plaintiff responded, "Have to get

---

[1]Lorcet is a brand name for hydrocodone bitartrate. See Phys. Desk Ref. 1027 (53rd ed. 1999). Hydrocodone bitartrate is a synthetic narcotic analgesic and antitussive with actions similar to codeine and is indicated for the relief of moderate to moderately severe pain. Id. at 1486.

[2]Soma, or carisoprodol, is a muscle relaxant with sedative properties, indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. See Phys. Desk Ref. 3202 (53rd ed. 1999).

out and work makes it real bad." She was prescribed Xanax[3], which she took for about four or five years for the panic attacks. (Tr. 215-16). With regard to her depression, plaintiff testified that she cried without reason once or twice a week. She had taken the antidepressant Paxil[4] for four or five years, but her physician had recently stopped prescribing it because he thought she was "better." She anticipated that he would reinstate her prescription when she next saw him. (Tr. 216-17). The medications did not cause any side effects. (Tr. 218).

Plaintiff testified that she did not drive because she had limited control over her right leg. (Tr. 218). When asked whether she went out to visit friends or relatives, plaintiff stated she had no relatives, but she visited one friend, every now and then. She did not attend church or group meetings. (Tr. 218-19).

Plaintiff testified that her son "used to have to help" her get dressed and take showers because she fell out of the shower when her leg gave out. She also stated that she could not lift her leg into the shower. (Tr. 219). When asked to elaborate, plaintiff testified that, although she could walk, she did not have much control. She further testified that she had lost sensation in her right leg and could not feel pressure on it. (Tr. 219).

_____

[3]Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[4]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

Plaintiff testified that she dressed and bathed every day, occasionally with help. She did not engage in any outdoor activities or yard work. She cooked about once or twice a month. She had recently done laundry for the first time in four months. She was unable to sweep or vacuum. (Tr. 220). She was able to make the bed and wash dishes "sometimes." (Tr. 221). When asked whether she shopped for groceries, plaintiff stated that she might "run in" to a store and get a soda "once in a blue moon." (Tr. 221).

### B. Social Security Application and Related Documents

On August 25, 2003, plaintiff completed a Disability Report as part of her initial application. (Tr. 58-67). She indicated that her back and leg limited her ability to work and that she was unable to bend over, lift, or stand or sit for very long and that she was in constant pain. (Tr. 59). She listed two treatment providers and indicated that she was not taking any medications and had not had any tests. (Tr. 61-64). Plaintiff stated that she had worked ten hours a day, seven days a week at her job as a rubber-stamp assembler. She allocated the hours spent on different activities in the work day as follows: walking -- two hours; standing -- two hours; sitting -- two hours; handling, grabbing or grasping big objects -- two hours; reaching -- two hours; and writing, typing or handling small objects -- one hour. The heaviest weight she lifted was fifty pounds; she frequently lifted less than ten pounds. (Tr. 60).

On September 23, 2003, plaintiff completed a background questionnaire. (Tr. 81-86). She stated that she could not stand or sit longer than fifteen minutes, was unable to bend over, and could not pick up anything that weighed more than five pounds. She also stated that she could not walk due to pain, and that she experienced pain in her entire right side. She stated that she had to use an inhaler every four hours. She indicated that she had not received any treatment since filing her claim because she had no insurance. (Tr. 81-82). She was able to pay her bills, complete a money order and count change, but could not keep a checkbook in order. (Tr. 83). She stated she was unable to complete any of thirteen listed activities, including washing dishes, ironing, banking, or going to the post office. (Tr. 83). With regard to self care, plaintiff found it very hard to wash and brush her hair without help; she ate easily prepared meals, such as soup or cereal. She had difficulty falling asleep and remaining asleep.

When asked to describe her activities or hobbies, plaintiff wrote, "nothing, watch T.V. sometimes & cry all of the time." On an average day, she would "lay on the couch and try to talk on the phone" when the pain permitted. Most of her day was occupied by "pain and crying." She indicated that she could not watch a thirty-minute television show. (Tr. 84). She did not read because her eyes hurt and she could not "see anymore." She did not play video games, do puzzles or use a computer. She indicated that she did not have a driver's license and was not able to drive. She left the house about once a month. She indicated that she had

difficulties following instructions because her mind was "not all there due to a nerve problem." She also stated that she had trouble getting along with others due to "nerves." In response to a question asking whether there was anything else she wanted to explain about her condition, plaintiff wrote that she could not breathe, was unable to go to the doctor because she had no insurance, and was about to have a nervous breakdown "due to no medicine." (Tr. 85).

In the Claimant's Statement form, plaintiff wrote that "her whole right side is in very bad pain," and that her fingers and hands were unable to hold anything. (Tr. 87). She stated that she had had an MRI and nerve conduction test, and was seeing a doctor once a month. She listed her medications as Lorcet, Flexeril,[5] and Xanax. (Tr. 88).

Plaintiff's work-history self-report indicates that she worked as an assembler from 1999 through 2001. (Tr. 92). The record contains an Earnings Query that establishes that plaintiff received FICA earnings intermittently between 1977 and 2002. Her annual earnings did not exceed $10,000 until 2000, when she earned $13,063.33. Her highest earnings – $26,821.19 – were received in 2001.

## C.  **Medical Evidence**

---

[5]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

Plaintiff received medical treatment in Florida, where she resided when she was injured, from May 21, 2002, until January 2, 2003. There is no documentation that plaintiff received medical care again until October 28, 2003, when she was evaluated in Missouri for a disability determination. (Tr. 120).

On May 21, 2002, plaintiff was seen by R.V. Radin, M.D., for a psychiatric evaluation. (Tr. 94-96). She reported that she was divorced, with children in foster care in Missouri. She complained of poor sleep, decreased appetite, and increased depression and anxiety. She stated that she had had an accident a year earlier while working for her brother at a rubber stamp company. She stated that she did not "do much at all, [but] sit[] and stare[] at the wall." Dr. Radin noted that plaintiff dropped out of school in the eleventh grade. She had been treated for depression fourteen or fifteen years earlier. Plaintiff's medical history included a back injury with secondary arthritis, for which she occasionally took Naproxen. She reported that she smoked cigarettes and denied the use of alcohol or drugs. The mental status examination indicated that plaintiff was oriented to time, place, and person. She was found to have good memory and average intellect, with no indication of psychotic symptoms or suicidal or homicidal ideation or tendencies. Her mood and affect were depressed; her insight and judgment were rated fair to good, with good motivation for getting help. She had no unusual personality disorder traits. Dr. Radin diagnosed plaintiff with Adjustment Disorder with Depressed Mood and possible Dysthymic Disorder on Axis I, and at Axis V, a Global

Assessment of Functioning (GAF) score of 60.[6]  Plaintiff was prescribed Paxil, Vistaril,[7] and Trazodone[8] and scheduled for follow-up in four weeks.

Plaintiff was seen at Circles of Care for a psychiatric diagnostic interview by nurse practitioner Lana Meyer on July 16, 2002.  (Tr. 98).  Plaintiff reported a history of anxiety and depression and presented as anxious and mildly depressed with congruent affect.  Plaintiff requested a prescription for Xanax, stating it was the "only thing that ever worked" for her anxiety attacks.  However, Nurse Meyer was not able to prescribe Xanax and instead increased plaintiff's dosages of Paxil and Trazodone. Plaintiff was encouraged to seek counseling.

Robert Mixco, M.D., completed a neurological evaluation on August 2, 2002.  (107-08, 152-53).  Plaintiff told Dr. Mixco that she had been moving boxes at work on March 8, 2002, when she felt something "pop" in her lower back.  She complained of pain in the low back and right leg, and an inability to sit or stand for long periods, and an inability to bend over.  Plaintiff also stated that she had difficulty sleeping.  She reported that she was frustrated with being unable to work and her financial situation was "not so

---

[6]A GAF of 55-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  See chart, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

[7]Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis.  See Phys. Desk Ref. 2217 (52d ed. 1998).

[8]Trazodone is indicated for the treatment of depression. See Phys. Desk. Ref. 539-40 (53rd ed. 1999).

good." Dr. Mixco reviewed an MRI completed in May 2002 that demonstrated mild diffuse central disc desiccation and degenerative changes. There was no indication of disc herniation, neural foraminal or spinal stenosis. Plaintiff reported no relief from physical therapy and treatment with Naproxen,[9] Bextra,[10] and Skelaxin.[11] (Tr. 107). Contrary to what Dr. Radin had noted on May 21, 2002 (Tr. 94), plaintiff stated that she did not smoke cigarettes, but did drink "two or three beers occasionally." (Tr. 107). On examination, plaintiff had normal range of motion of the neck and straight leg raising was negative. Muscle size, tone and strength, as well as sensation, were intact throughout, with questionable weakness on eversion of the right foot. Plaintiff's gait was antalgic. Dr. Mixco noted that plaintiff presented with symptoms suggestive of lumbar radiculopathy and possible sciatic syndrome. In the absence of past improvement with physical therapy and MRI findings that were "not significantly impressive," he recommended evaluation by a chiropractor. (Tr. 108).

Plaintiff saw Nurse Meyer again on August 13, 2002. She again requested Xanax, stating that the increased Paxil made her "too nervous." (Tr. 99). On mental status examination, plaintiff was

---

[9]Naproxen is the generic name for Naprosyn.

[10]Bextra, also known as Valdecoxib, was prescribed for the treatment of osteoarthritis and rheumatoid arthritis. It was removed form the market in April 2005. See RxList, found at www.rxlist.com/cgi/generic/bextra_ids.htm.

[11]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

found to be anxious but not depressed. Nurse Meyer reduced plaintiff's Paxil dosage and referred her to a psychiatrist.

Findings in a nerve conduction study completed on August 28, 2002, were consistent with right L5 radiculopathy. There was no clear evidence of peripheral neuropathy or entrapment neuropathy affecting the peroneal or tibial nerves. (Tr. 154).

Plaintiff returned to Dr. Mixco on September 10, 2002. She related that "one day recently at work she bent over and was unable to straighten up." She reported that the drug Mobic[12] "did nothing for her pain." He noted tenderness in plaintiff's lumbar area. He opined that her prognosis was guarded, and again recommended pain management and evaluation by a chiropractor. He prescribed Lortab.[13] (Tr. 109, 151).

Plaintiff saw T. Baskaran, M.D., on September 11, 2002. (Tr. 100). Dr. Baskaran observed that plaintiff walked "very carefully." Her affect and mood appeared anxious and she was preoccupied with her physical problems. Dr. Baskaran added Xanax to plaintiff's medications. At follow-up on November 6, 2002, plaintiff reported that she was under "a great deal of stress" and felt helpless. Her son was in jail, and she might require surgery for her back problems. She reported difficulty sleeping. Dr.

---

[12]Mobic, or meloxicam, is a nonsteroidal, anti-inflammatory used to treat the signs and symptoms of arthritis. See U.S. Food and Drug Administration, Center for Drug Evaluation and Research, found at: http://www.fda.gov/cder/consumerinfo/druginfo/mobic.htm

[13]Lortab is a combination of acetaminophen and hydrocodone bitartrate, a semisynthetic narcotic analgesic, indicated for the relief of moderate to moderately severe pain. See Phys. Desk Ref. 3314-15 (60th ed. 2006).

Baskaran increased plaintiff's Paxil dosage, continued the Xanax, and added Zyprexa[14] as a sleep aid. (Tr. 101).

At a scheduled followup with Dr. Mixco on October 15, 2002, plaintiff continued to complain of chronic, severe low-back pain and claimed that her legs had been going out from under her. (Tr. 110, 150). She also reported that she had been working four hours a day with restrictions. On examination, plaintiff had normal ranges of motion; straight leg raising and Yeoman's sign were negative bilaterally. Muscle size, tone and strength were intact, with no atrophy, abnormal sensations, tenderness, heat, swelling, or erythema. There was no ataxia[15] of gait, but plaintiff walked with a limp. Dr. Mixco recommended evaluation by a pain specialist and advised her to remain off work until further notice.

Plaintiff returned to Dr. Mixco on November 20, 2002. (Tr. 111). She reported that her pain remained unchanged and that her right leg had been "giving out." On examination, plaintiff's gait was normal and straight leg raising was negative. Dr. Mixco could not determine why her leg was giving out because the results of examination and testing were normal. He recommended a second

---

[14]Zyprexa is a psychotropic agent indicated in the treatment of schizophrenia and bipolar disorder. See Phys. Desk Ref. 1798-99 (60th ed. 2006).

[15]An inability to coordinate muscle activity during voluntary movement. Stedman's Med. Dict. 161 (27th ed. 2000).

opinion and changed her medication to Neurontin[16] and Skelaxin.[17] He declined her request to write a letter to have her son released from jail to care for her. (Tr. 111, 149).

On December 4, 2002, plaintiff reported to Dr. Baskaran that the Zyprexa made her feel "weird" so she threw it away. She continued to complain of problems with sleep. On examination, Dr. Baskaran found plaintiff to be anxious with rapid speech. There were no indications of a thought disorder or psychosis; insight and judgment were fair. Dr. Baskaran prescribed Xanax and Remeron.[18] (Tr. 102).

Plaintiff's son called Dr. Mixco on December 11, 2002, to report that the Neurontin was causing plaintiff to vomit blood. Dr. Mixco directed her to go to the emergency room for further evaluation. (Tr. 114, 148). When plaintiff saw Dr. Mixco five days later, however, she reported that she had not gone to the emergency room because she did not have transportation. (Tr. 115, 147). During the office visit, plaintiff complained of increased pain in her right leg. She ambulated without assistance, however, and walked on heels and toes without difficulty.

---

[16]Neurontin is the brand name for Gabapentin, prescribed for the treatment of epilepsy and neuropathic pain. http://en.wikipedia.org/wiki/Neurontin.

[17]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

[18]Remeron, or Mirtazapine, is prescribed for the treatment of depression. http://en.wikipedia.org/wiki/Mirtazapine.

On January 2, 2003, Dr. Baskaran described plaintiff as "doing well. She is planning to move to live with her ex-husband." Her mood and affect were relaxed. Her prescriptions for Paxil, Xanax, and Remeron were continued. (Tr. 103).

The record includes a "Medical Report Including Physician's Certification/Disability Evaluation," completed on October 9, 2003, by Nurse Practitioner, L. Butler, R.N.B.C., F.N.P.[19] (Tr. 157-58). Plaintiff complained of bronchitis, chronic back pain, and pain in the right arm, hand, shoulder and leg, with decreased strength on the right side. She reported that sometimes her leg "just goes out." She reported that she had experienced pain since suffering a back injury on March 8, 2002. She denied any hospitalizations in the last year. The only medication noted was an Albuterol[20] inhaler. Nurse Butler noted that plaintiff had seen a neurologist and orthopedist but did not bring reports with her. Nurse Butler opined that further diagnostic evaluations by an orthopedist and a neurologist were indicated. Finally, Nurse Butler indicated that plaintiff had a disability that prevented her from engaging in employment, with an expected duration of six to twelve months. The report does not indicate whether Nurse Butler's determination was based upon an examination of plaintiff or a review of a medical

---

[19]Plaintiff's brief in support of her complaint frequently refers to the opinion of "Dr. Rustico Simpelo," to whom the Missouri Department of Social Services caseworker addressed the form. The form was actually completed by Nurse Butler.

[20]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

record.  The report does state that Nurse Butler had not treated plaintiff within the past year.

On October 28, 2003, plaintiff was seen for a disability determination by Steven D. Mellies, D.O., at Neurologic Associates of Cape Girardeau, Inc. (Tr. 120-21).  Plaintiff reported low back pain that radiated into her right leg.  Additionally, she reported pain in the right arm and shoulder which had started three months earlier.  No injury preceded the onset of this pain, which was particularly noted whenever she tried to lift anything heavier than a half-gallon jug of milk.  She did not experience numbness. Plaintiff stated that she could comfortably sit, stand, or walk for only fifteen to twenty minutes at a time.  She walked without any assistive device and was able to dress and bathe herself.  She did no cleaning and only occasionally did simple cooking.  She reported that she had an eighth-grade education and could read a newspaper. She reported that she smoked one pack of cigarettes a day and drank "a six pack" a week.  She was taking no medication at the time of the examination.  On examination, plaintiff had no obvious muscle wasting and no significant tenderness on palpation.  She could ambulate and walk on her heels and toes without difficulty; straight-leg raising was negative bilaterally.  She squatted halfway, stating that further squatting would result in persistent back pain.  With regard to her arms, she had somewhat limited range of motion with her right arm.  She had normal hand grip and dexterity bilaterally and normal strength in both arms, although she complained of pain upon testing the right deltoid.  Dr.

Mellies' impression was that plaintiff "may have injured the right shoulder girdle." There was no evidence to support cervical radiculopathy. With regard to plaintiff's back pain, Dr. Mellies found no evidence of lumbar radiculopathy. He opined that plaintiff would have good use of her arms so long as she did not lift her right arm above shoulder level. He further opined that plaintiff's low back pain would impair lifting. He recommended that an orthopedic surgeon evaluate plaintiff's right shoulder and, in the event there was no significant surgical finding, vocational rehabilitation.

Plaintiff was seen by Seth Paskon, M.D., at the Potosi Medical Clinic on several occasions. On November 12, 2003, plaintiff was described as having the following conditions: (1) lumbar disc syndrome, (2) anxiety disorder, (3) chronic bronchitis, and (4) peptic ulcer disease. The notation includes the entry "? ADHD." (Tr. 175). On January 5, 2004, plaintiff complained of pain in the lower back, right leg, and right arm. Plaintiff reported that "w/o Xanax [she] would be a mess would either be crying or very mad." (Tr. 181).

Plaintiff had an MRI of the lumbosacral spine on January 7, 2004. The findings included right posterolateral disc herniations, in close proximity to right L3 and L4 nerve roots. There was no indication of direct impingement or central canal stenosis. Also identified was "mild diffuse degenerative spondylosis, seen with advancing age." (Tr. 182).

On February 20, 2004, plaintiff told Dr. Paskon that she had had a reaction to Paxil. She continued to complain of pain in the right shoulder, lower back, and leg. She also reported "nervousness, anxiety - meds helping." She was referred to a surgical center. (Tr. 180). At her next visit on March 23, 2004, however, she reported that she had not kept her appointment at the surgical center. (Tr. 179). She complained of allergy symptoms, caused by "dusting a lot." She continued to experience pain, anxiety, and nervousness. She reported that "only Xanax" helped with her anxiety. On April 23, 2004, she similarly reported that she experienced anxiety attacks and depression unless she had Xanax. Her back pain continued. (Tr. 178). On May 25, 2004, plaintiff reported that the police wanted a list of her medications. Her pain was undiminished, and plaintiff reported that she could not walk. The note does not indicate what was observed on examination. (Tr. 177).

Plaintiff was admitted to the Parkland Health Center on September 15, 2004, having been "found standing at the road side – confused, crying, walking in circles – told ambulance crew 'couldn't think.'" (Tr. 160). She was diagnosed with altered mental status, a urinary tract infection, and dehydration. She denied taking any drugs; however, blood tests indicated the presence of amphetamines and benzodiazepines. (Tr. 162, 165, 170). A CT scan performed during her admission was unremarkable. (Tr. 171). Plaintiff was discharged on September 17, 2004, with a referral to a drug rehabilitation center. (Tr. 166).

Plaintiff was seen at the Potosi Medical Clinic on September 23, 2004. She reported that her purse had been stolen and that she needed refills on all of her medication. She continued to complain of pain. (Tr. 176).

Orthopedic surgeon William K. Harris, D.O., examined plaintiff on October 12, 2004. (Tr. 172). Plaintiff did not limp and walked without an ambulatory aid. She reported low back pain arising from the work injury, with progressively increased pain. She complained of pain in her right leg that radiated down to her ankle. She also complained of neck pain with radiation into her right arm and shoulder. She described occasional parasthesias of her hands and feet. She denied bowel or bladder problems or increased pain with coughing or sneezing. Upon examination, plaintiff had normal ranges of motion of the cervical spine, shoulders, elbows, and wrists. She had no muscular atrophy or fasciculations.[21] She could make a fist and had full grip strength. The diagnostic impression was mechanical low back pain and neck pain without signs of radiculopathy; Dr. Harris noted that "the MRI need[ed] to be obtained and reviewed."

### III.   The ALJ's Decision

The ALJ made the following findings:

1.    Plaintiff met the requirements of the Social Security Act for a period of disability and Disability Insurance Benefits through the date of the decision.

---

[21]An involuntary contraction, or twitching, of groups of muscle fibers. Stedman's Med. Dict. 650 (27th ed. 2000).

2.   Plaintiff had not engaged in substantial gainful activity
     since the alleged onset of disability.

3.   Plaintiff suffered from mild to moderate dysthymic
     disorder, generalized anxiety disorder, degenerative
     changes of lumbar spine, and possible injury of the right
     shoulder, which are considered severe based on the
     requirements in the Regulations 20 C.F.R. §§ 404.1520(c)
     and 416.920(c).

4.   The medically determinable impairments did not meet or
     medically equal one of the listed impairments in 20
     C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff did
     not have a mental impairment or combination of mental
     impairments that met or equaled the criteria of any
     impairment listed in 20 C.F.R. Part 404, Subpart P,
     Appendix 1, §§ 12.02-12.10 (Listings 12.02-12.10),
     pursuant to the mental impairments evaluation required by
     20 C.F.R. §§ 404.1520a and 416.920a.  Plaintiff had only
     mild restrictions of activities of daily living and
     difficulties in maintaining social functioning.
     Plaintiff had moderate difficulties in maintaining
     concentration, persistence, or pace if required to do
     detailed or complex work; if plaintiff were restricted to
     unskilled tasks that could be learned within thirty days,
     she had only mild limitations in these areas.  Plaintiff
     had no episodes of decompensation of extended duration.
     Plaintiff's impairments and limitations did not meet or
     equal the C Criteria of Listing 12.02, 12.03, 12.04, or
     12.06.

5.   Plaintiff's allegations regarding her limitations were
     not totally credible.

6.   Plaintiff retained the residual functional capacity to
     perform the exertional and nonexertional requirements of
     work with the following limitations: plaintiff could lift
     and carry fifty pounds occasionally and twenty-five
     pounds frequently; could stand and/or walk about six
     hours in an eight-hour work day with normal breaks and
     sit about six hours in an eight-hour work day with normal
     breaks; and was able to perform work consistent with
     unskilled work as well as jobs she had previously
     learned, such as rubber stamp assembler.

7.   Plaintiff's past relevant work as a rubber stamp
     assembler did not require performance of work-related
     duties precluded by her residual functional capacity.

8.   Plaintiff's impairments did not prevent her from
     performing her past relevant work.

9.  Plaintiff was not under a disability at any time relevant
    to the decision.

(Tr. 19-20).

## IV. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work

activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   The ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.   Plaintiff's Allegations of Error**

The ALJ determined at Step 4 of the analysis that plaintiff could return to her past relevant work and thus was not disabled. Plaintiff's appeal raises the following issues: (1) whether the ALJ properly considered plaintiff's subjective complaints under the Polaski standards; (2) whether the ALJ properly determined

-22-

plaintiff's residual functional capacity; (3) whether the ALJ properly considered plaintiff's past relevant work; and (4) whether the ALJ erred in failing to obtain the testimony of a vocational expert.

**1.     The ALJ's consideration of subjective complaints under Polaski**

Plaintiff argues that the ALJ failed to properly assess her subjective complaints regarding pain, mental impairment, daily activities, and ability to concentrate.  In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

The ALJ found that plaintiff's subjective complaints were not credible.  The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make.  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322.  Where an ALJ explicitly considers the Polaski factors but then discredits the plaintiff's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

The ALJ noted that plaintiff's complaints of pain far outweighed the clinical findings. In addition, the medical record did not reveal the presence of significant clinical signs associated with chronic pain. Furthermore, plaintiff had not participated in pain management treatment and had had a significant time gap in her treatment. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (limited treatment of symptoms and failure to diligently seek treatment, combined with other factors, supported credibility determination). Plaintiff did not take particularly strong doses of pain medication and experienced some relief without significant side effects. See Polaski, 739 F.2d at 1322; see also Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (noting that "[i]mpairments that are controllable or amenable to treatment do not support a finding of disability").

With regard to plaintiff's activity level, the ALJ noted that plaintiff's self-described limitations exceeded those recommended by treating physicians. In addition, there was no lay testimony in support of plaintiff's complaints of limited ability. The ALJ noted that plaintiff's appearance during the hearing was not consistent with disabling pain. Furthermore, plaintiff did not follow up on referrals to counseling as recommended by Nurse Lana Meyer; evaluation by a chiropractor and pain specialist as recommended by Dr. Mixco; vocational rehabilitation as recommended by Dr. Mellies; and drug rehabilitation as recommended by Parkland Health Center. A failure to follow a recommended course of treatment weighs against a claimant's credibility. Guilliams v.

-24-

Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); Brown v. Chater, 87
F.3d 963, 965 (8th Cir. 1996).

The ALJ properly considered the Polaski factors and identified
inconsistencies between plaintiff's allegations of disabling
symptoms and the medical record.  The Court finds no error in the
ALJ's decision to discount plaintiff's subjective complaints.

## 2. The ALJ's assessment of plaintiff's Residual Functional Capacity

A claimant's residual functional capacity (RFC) is what she
can do despite her limitations.  20 C.F.R. § 404.1545.  The RFC is
a "function-by-function assessment based upon all of the relevant
evidence of an individual's ability to do work-related activities."
S.S.R. 96-8p, 1996 WL 374184 at *3 (Soc. Sec. Admin. July 2, 1996).
The determination of residual functional capacity is a medical
issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which
requires the consideration of supporting evidence from a medical
professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).
It is the claimant's burden, rather than the Commissioner's, to
prove the claimant's RFC.  Pearsall v. Massanari, 274 F.3d 1211,
1217 (8th Cir. 2001).  It is the ALJ's responsibility to determine
the claimant's RFC based on all relevant evidence, including
medical records, observations of treating physicians and others,
and the claimant's own description of her limitations.  Id.

The ALJ determined that plaintiff retained the capacity to
perform the exertional and nonexertional requirements of work with

the following limitations: plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could stand and/or walk about six hours in an eight-hour work day with normal breaks and sit about six hours in an eight-hour work day with normal breaks. Plaintiff complains that in making the RFC determination the ALJ did not properly evaluate the medical evidence with regard to her low back pain, right shoulder pain, and mental impairments.

As noted above, the clinical findings support a finding of a nondisabling back condition. An MRI taken shortly after the workplace injury showed mild changes that neurologist Roberto Mixco opined were "not significantly impressive." Another MRI performed on January 7, 2004, similarly showed mild herniation and "mild diffuse lumbar degenerative spondylosis seen with advancing age." The ALJ noted that, with one exception, upon examination plaintiff had negative straight leg raising, and normal or near normal muscle strength in the lower extremities with normal reflex and sensory findings. Plaintiff's gait was typically observed to be normal and she did not require an assistive device.

Plaintiff argues that the ALJ improperly discounted the opinion of Nurse L. Butler that plaintiff was disabled due to back pain, with an expected duration of six to twelve months. The amount of weight given to a medical opinion is governed by several factors, including the examining relationship, the treatment relationship (including the length of the relationship and frequency of examinations, and the nature and extent of the

relationship), the amount of evidentiary support provided for the opinion, consistency of the opinion with the record as a whole, and specialization of the opinion provider. 20 C.F.R. § 404.1527(d). The ALJ discounted Nurse Butler's opinion because Nurse Butler was not a physician, had never treated plaintiff, did not have access to plaintiff's previous treating records, did not articulate specific clinical findings based upon examination, and was not a vocational expert and did not articulate any specific functional limitations. The ALJ correctly determined that Nurse Butler's report was entitled to little or no weight.

Plaintiff also alleges that the ALJ erred in the weight given to the opinion of consultative physician Dr. Mellies that plaintiff's back pain limited her ability to lift. The ALJ properly discredited this aspect of the opinion because Dr. Mellies did not specify a weight restriction. See Tuttle v. Barnhart, 130 Fed. Appx. 60, 61-62 (8th Cir. 2005) (ALJ properly did not accept physician's unexplained RFC determinations). Furthermore, upon examination, Dr. Mellies found no evidence that plaintiff experienced lumbar radiculopathy, focal weakness, sensory loss, or reflex asymmetry and thus the ALJ could properly conclude that Dr. Mellies's opinion was unsupported by the medical data. The Court finds no error.

The ALJ listed a "possible" injury of the right shoulder as a severe impairment under 20 C.F.R. §§ 404.1520(c) and 416.920(c). As a consequence, plaintiff contends, the ALJ was required to identify restrictions attributable to the shoulder injury.

Presumably, the ALJ was giving plaintiff the benefit of the doubt by including a possible shoulder injury among her impairments. Nonetheless, the clinical findings concerning plaintiff's shoulder were unremarkable: Range of motion was found to be only slightly limited by Dr. Mellies while Dr. Harris found no limitation. Plaintiff had normal upper extremity strength, grip strength, and manual dexterity.

Plaintiff contends that the RFC did not properly assess her mental impairments. Contrary to plaintiff's assertion, no treatment provider diagnosed plaintiff with attention deficit hyperactivity disorder. With regard to depression, panic disorder, and anxiety disorder, plaintiff was assigned a Global Assessment of Functioning score of 60, which denotes moderate symptoms or difficulty. Treatment notes from Dr. Paskon consistently indicated that plaintiff's symptoms improved with medication.

The ALJ determined that plaintiff had no more than mild to moderate mental limitations and retained the residual functional capacity to perform unskilled work that can be learned within thirty days. (Tr. 18). In reaching that conclusion, the ALJ found no serious impairment in plaintiff's cognitive abilities, mental processes, social skills, and capacity to handle normal stress. He noted that she had not required repeated hospitalizations or intensive psychotherapy and that medication effectively treated her symptoms of anxiety and depression. Furthermore, she did not display mental dysfunction during the hearing.

Plaintiff contends that the ALJ erred in failing to consider her referral to pain management services when assessing her RFC. However, plaintiff did not comply with the recommendation and thus her argument carries little weight. Plaintiff similarly argues that the ALJ did not properly account for her episode of disorientation. Physicians attributed the September 2004 incident to probable drug use rather than to a disabling condition. Finally, plaintiff contends that the ALJ failed to take into account the fact that she was prescribed narcotics for pain relief.[22] Dr. Mixco prescribed the narcotic Lortab in September 2002; plaintiff reported in October 2002 that it did not help her pain and new medications were prescribed. In 2004, plaintiff reported to orthopedic surgeon Dr. Harris that Dr. Paskon prescribed the narcotic Lorcet. As the ALJ noted, however, Dr. Paskon's treatment notes do not contain any clinical assessments of the pain or its likely cause. Under this circumstance, the Court concludes that the ALJ did not err in giving little weight to the use of narcotic medications.[23]

Plaintiff argues, generally, that the ALJ failed to insure the record was fully and fairly developed, leading to the alleged deficiency in the RFC determination. A social security hearing is

_____

[22]Plaintiff points to prescriptions for Skelaxin (a muscle relaxant, not a narcotic), Mobic (a nonsteroidal antinflammatory), Hydroxyzine (indicated for treatment of anxiety and tension), and Lorcet.

[23]The Court has not been able to find a reference to Lorcet in Dr. Paskon's notes.

a nonadversarial proceeding and the ALJ has the duty to fully develop the record. <u>Smith v. Barnhart</u>, 435 F.3d 926, 930 (8th Cir. 2006). That duty extends to cases where, as here, an attorney represents the claimant at the administrative hearing. <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004). While the ALJ must neutrally develop the facts, the ALJ need not seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is permitted to issue a decision without obtaining additional medical evidence so long as the evidence in the record provides a sufficient basis for the ALJ's decision. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995).

The regulations provide that the Commissioner will recontact treating physicians "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable . . . diagnostic techniques." 20 C.F.R. § 416.912(e)(1). 20 C.F.R. § 416.927(c)(3) similarly provides that the Commissioner will request additional information "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or, if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled."

Plaintiff does not identify a specific deficiency in the medical record. The Court finds that the evidence in the record provides a sufficient basis for the ALJ's decision and that no

additional records were required.  The Court further concludes that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.

### 3.   The ALJ's determination that plaintiff can return to her past relevant work

Plaintiff contends that the ALJ did not adequately support the determination that she was capable of returning to her past relevant work as a rubber stamp assembler.

"An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements.  The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity." Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999) (quoting Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991)).  The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work.  Id.

The ALJ made detailed determinations of plaintiff's RFC and mental limitations.  He also adopted plaintiff's articulation of the demands of her past work as a stamp assembler.  He then compared the RFC and the job demands and concluded that plaintiff could return to her past relevant work.  The Court concludes that plaintiff's argument is without merit.

### 4.   The ALJ's failure to obtain the testimony of a Vocational Expert

Plaintiff contends that the ALJ was required to obtain the testimony of a Vocational Expert because the record establishes that she had significant nonexertional impairments. The ALJ determined that plaintiff was capable of performing her past relevant work. Once this decision is made there is no burden shifting and the services of a vocational expert are not necessary. Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996).

## V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#14] is **denied**.


A separate judgment in accordance with this order will be entered this same date.


CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 5th day of September, 2006.